**CHEMICAL DYNAMICS, INC., d/b/a the Schultz Co., Plaintiff-Appellant,**

v.

**Lawrence NEWFELD and Frieda Newfeld, his wife, Harry Schultz and Darlene Schultz, his wife, and Sol Schultz, Defendants-Respondents.**

No. 51468.

Missouri Court of Appeals,
Eastern District,
Division Three.

March 10, 1987.

Motion for Rehearing and/or Transfer Denied April 9, 1987.

Application to Transfer Denied
May 19, 1987.

Kenneth M. Romines, Curtis, Bamburg & Crossen, Clayton, for plaintiff-appellant.

Edward P. McSweeney, Padberg, McSweeney, Slater, St. Louis, for defendants-respondents.

CRANDALL, Judge.

Plaintiff, Chemical Dynamics, Inc., d/b/a The Schultz Co. (corporation), appeals from the judgment, in a court-tried case, in favor of defendants, Lawrence Newfeld, Frieda Newfeld, his wife, Harry Schultz, Darlene Schultz, his wife, and Sol Schultz, in an action based upon defendants' purchase of certain real estate allegedly in violation of their fiduciary duties as directors of the corporation. We affirm.

The record reveals that corporation is a closely held family corporation with 40 outstanding shares, 23 of which are held either by the Schultz family or by the Schultz family trust and 17 of which are held by 20 separate non-family shareholders. At all times pertinent to this action, plaintiff, A.Y. (Abe) Schultz, and defendants, Sol Schultz and Lawrence Newfeld, were the managing officers and directors of the corporation.

On December 6, 1967, corporation entered into a lease for a building at 11730 Northline Industrial Drive in Maryland Heights, Missouri, for use as its offices and manufacturing facilities. The term of the lease was to expire on March 31, 1973. The lease contained a provision which gave to corporation an option to purchase the property for the sum of $300,000 and to assume an existing deed of trust with an original face amount of $250,000. The option was duly recorded.

In 1970, corporation was experiencing financial difficulties. By October, 1970, corporation was six to seven months in arrears with its rental payments on the building. The owners of the property brought a rent and possession suit and judgment was rendered against corporation for possession and for back rent. On November 20, 1970, the owners arrived at the corporate quarters, with a sheriff and a locksmith, to evict corporation.

Faced with the possible demise of the business, Sol Schultz negotiated with the owners. They reached an agreement whereby, in return for a payment of $21,-492.38, corporation would remain in the building and owners would assign the lease with the purchase option. The money had to be paid by 2:00 p.m. that same day. Sol Schultz contacted several shareholders about loaning the corporation that amount of money in return for the option to purchase the building. They all refused.

Finally, Lawrence Newfeld and his wife borrowed money to lend to the corporation and signed a second mortgage on their home to secure the loan. In return for the loan, corporation gave Newfeld a promissory note, an assignment of the lease, and a chattel mortgage on the corporation's equipment. The lease assignment was styled "Bill of Sale" and provided in pertinent part:

> For and in consideration of a loan to us in the sum of Twenty-One Thousand Four Hundred Ninety-Two Dollars and Thirty-Eight cents ($21,492.38), made to us this date by Lawrence Newfeld to protect our creditors and stockholders by preventing the physical closing of our doors and eviction by the Sheriff of St. Louis County, who appeared on our premises this date with a court order demanding immediate satisfaction of a judgment of the landlord for unpaid rent in said amount, and being unable to meet the demand, we, Schultz Company, hereby secure payment of our note this date to Lawrence Newfeld, by assigning to him full title to our lease, and we agree to rent the building hereafter from him on a month to month basis, at the monthly rent specified in said lease, surrender-

ing to him all provisions and benefits of the lease.

A.Y. Schultz and Sol Schultz signed the lease assignment as agents of the corporation. A.Y. Schultz testified that the motive for executing these three instruments was "to protect Lawrence Newfeld in the best way I could under the conditions; to stand first in line as a creditor to get back his twenty-one thousand dollars in the event of receivership." Corporation remained in the building and continued its operation.

In February, 1973, owners notified Lawrence Newfeld that, although the option to purchase the building had expired,[1] they were willing to sell the building for $336,-000. In April, 1973, Newfeld informed owners of his intention to exercise the option for the $300,000 option price. On October 1, 1973, in accordance with the option, Newfeld and his wife purchased the property for $300,000. He assumed the first deed of trust in the amount of $213,-793.13. In addition, in return for a loan of $70,000 from another defendant, Harry Schultz, Newfeld gave Harry a second deed of trust on the property; and he and Sol Schultz signed a promissory note, payable on demand to Harry. On January 22, 1984, Newfeld and his wife executed a quitclaim deed to Harry Schultz, giving him an undivided one-half interest in the property.

A.Y. Schultz testified that he was aware that Lawrence Newfeld had exercised the option to purchase the real estate, but that he was under the impression that Newfeld had done so in the name of the corporation. A.Y. stated that he later discovered that Newfeld owned the property individually. In 1975, after every creditor had been paid in full, A.Y. demanded that the property be returned to the corporation because "there was no longer any danger of the building being confiscated by creditors." A.Y. alleged that Sol Schultz and Newfeld refused to return the building and offered to "cut [him] in for a third." A.Y. declined the offer. Corporation never acquired title to the property, which has increased considerably in value.

In 1976, A.Y. Schultz instituted the present action on behalf of the corporation. His petition sounded in three counts: Count I sought the conveyance of the property to corporation; Count II sought an accounting and punitive damages for the monies diverted from the corporation by Sol Schultz and Lawrence Newfeld because they usurped a corporate opportunity when they purchased the property; and Count III sought actual and punitive damages for breach of Sol Schultz's and Newfeld's fiduciary duties to the corporation.

The trial court found that corporation "knowingly, willingly and voluntarily sold, bargained, granted and transferred its entire interest in the lease, including the option to purchase the real estate, to Newfeld as a consideration for the loan of November 20, 1970...." The court stated: "Newfeld is entitled to commendation, rather than censure, for loaning [corporation] the funds which avoided its eviction." The court further concluded that the corporation was not entitled to equitable relief because of A.Y. Schultz's unclean hands in determining "to pursue this litigation, with full knowledge the [corporation] fairly and openly bargained and transferred away all its interest in the leasehold...."

In its first point, corporation avers error in the trial court's finding that Lawrence Newfeld and Sol Schultz did not breach their fiduciary duty to the corporation when they allegedly seized for their own benefit the business opportunity to purchase the building leased by corporation. Corporation argues that a constructive trust should be imposed upon the property and that Newfeld should be required to transfer the property to corporation.

It is well recognized that a director or officer of a corporation occupies a fiduciary relation to the corporation and its shareholders. *Ramacciotti v. Joe Simpkins, Inc.*, 427 S.W.2d 425, 431 (Mo.1968). Accordingly, he may not profit personally at the expense of the corporation or of its shareholders. *Id.* If he does so profit, he

---

**1.** The option in the lease required: "Said option to purchase to be exercised within a thirty (30) day period ending ninety (90) days prior to the termination of the original term of this lease." The lease expired on March 31, 1973.

may be held to be a trustee, as to those profits, for the benefit of the corporation. *Id.*

■ Pursuant to this fiduciary duty, the so-called corporate opportunity doctrine forbids a corporate director from acquiring for his own benefit an opportunity that would have been valuable and germane to the corporation's business, unless that opportunity is first offered to the corporation. *Nicholson v. Evans*, 642 P.2d 727, 730 (Utah 1982). This duty applies to an opportunity which is "in the line of the corporation's business and is of practical advantage to it, [or] is one in which the corporation has an interest or a reasonable expectancy...." *Guth v. Loft*, 23 Del.Ch. 255, 5 A.2d 503, 511 (1939).

■ If, however, a business opportunity is presented to an officer in his individual capacity, rather than in his official capacity as an officer or director, the opportunity is that of the officer and not that of the corporation. *Paulman v. Kritzer*, 74 Ill. App.2d 284, 219 N.E.2d 541, 546 (1966). The test of whether a particular opportunity is an individual or corporate one "seems to be whether there was a specific duty, on the part of the officer sought to be held liable, to act or contract in regard to the particular matter as the representative of the corporation—all of which is largely a question of fact." *Id.* (citation omitted).

■ The pivotal question is whether, under the facts of this case, the option to purchase the building constituted a corporate opportunity. Here, on November 20, 1970, the corporation was in severe financial straits and eviction from its business quarters was imminent. If corporation was evicted, manufacturing operations would have to shut down. Yet, corporation did not have either the money, the means, or the credit to come up with the money for back rent.

At that point, the managing directors, A.Y. Schultz, Sol Schultz, and Lawrence Newfeld, decided to raise the money by selling the lease which contained the option to purchase the building. This offer was made to several shareholders, who promptly refused. It was then that Lawrence Newfeld secured a second mortgage on his home to obtain the money to loan corporation over $21,000. As part of the loan transaction, Newfeld was assigned the lease which included the option to purchase the building.

Having benefited from Newfeld's loaning the money, corporation cannot now complain about Newfeld's exercising the option to purchase [2] the building for his own benefit. The record clearly shows that Newfeld was willing to invest his own funds to save a corporation which was operating at a loss and which was unable to pay its creditors. Newfeld risked his own money when other experienced businessmen had refused to do so. No element of fraud appears anywhere in the entire transaction. The assignment of the lease was consideration for the business risk which Newfeld was willing to take.

Further, there is no evidence that, when Newfeld exercised the option in 1973, he acted surreptitiously or in bad faith. By A.Y. Schultz's own admission, the corporation was not in the financial position to buy the building until 1975, two years after the purchase by Newfeld.

This is not a situation in which the corporate opportunity doctrine is applicable. Newfeld did not appropriate a business opportunity from the corporation. He merely exercised his rights under the lease which had been freely assigned to him by the corporation. The fact that Sol Schultz and Harry Schultz helped him in financing the purchase is immaterial. Had Newfeld not funded the corporation in 1970, there was a real danger that the corporation could not have continued and that, by 1973, the investment of every shareholder would have been lost. *See, e.g., Punch v. Hipolite Co.*, 340 Mo. 53, 100 S.W.2d 878, 887 (1936). Given these facts, Newfeld was under no duty to exercise the option for the benefit

2. Corporation contends that the option was no longer in existence when Newfeld exercised it. The facts, however, indicate that Newfeld notified the owner, admittedly later than the lease provided, that he wished to exercise the option to purchase. By permitting Newfeld to purchase for the option price of $300,000, owners apparently extended the option for Newfeld's benefit.

of the corporation. The option to purchase the building was an opportunity which belonged to him in his individual capacity, rather than in his official capacity. There was substantial evidence to support the trial court's conclusion that Newfeld, Sol Schultz, and Harry Schultz did not usurp a corporate opportunity. Corporation's first point is denied.

██ In its second point, corporation alleges that the trial court erred in finding that Lawrence Newfeld received an unconditional assignment of the lease. Corporation asserts that Newfeld received only a security interest in the lease, with the result that the option to purchase the building remained with the corporation and did not pass to Newfeld unless and until the corporation defaulted on its obligation to pay the rent.

A review of the language of the instrument executed in conjunction with the lease assignment negates corporation's claim. A.Y. Schultz and Sol Schultz, as agents of the corporation, signed a document entitled "Bill of Sale." The agreement stated that corporation secured payment of its note "by assigning to [Newfeld] full title to our lease ... surrendering to him all provisions and benefits of the lease." This language clearly indicates that the assignment of the lease was outright and unconditional, and was not intended to convey to Newfeld only a security interest in the loan.

The trial court recognized the significance of the corporation's assigning Newfeld the option to purchase. At the close of all the evidence, the court opined:

> Why in the world would Mr. Newfeld, who only became a stockholder as a result of being an employee of the company for a long time—who owned a very, very minimal amount—why would he and his wife take a second mortgage on their home to loan money to a corporation, where the attorney for the creditors al-

ready had three people ready to go into bankruptcy at any time, and where it was about to be thrown out on the street, unless there was something given to him?

> And that something was the option to buy the building....

There was ample evidence to support the trial court's determination that the assignment of the lease was unconditional. Corporation's second point is denied.

In view of our holding, we need not address corporation's third point which challenges the trial court's holding that the corporation was not entitled to equitable relief because of the unclean hands of A.Y. Schultz.

The judgment of the trial court is affirmed.[3]

PUDLOWSKI, P.J., and KAROHL, J., concur.

---

**3.** *See State ex rel. Schultz v. Schultz,* 710 S.W.2d 507 (Mo.App.1986) for other litigation involving the same corporation. In that opinion we observed:

> The internecine warfare involving this closely held family corporation amply demonstrates a deep and continuing animosity between the family members. *There can be no doubt that*

> *the litigation it has produced is of little benefit to the corporation.* But so long as the animosity exists and the two factions continue in full battle array, each side will find itself bound by the strictures of the corporate law of this state.

*Id.* at 509 (emphasis added).